## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 12 2017, 8:13 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

James B. Martin
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Erin C. Unger,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

July 12, 2017

Court of Appeals Case No.
12A02-1611-CR-2555

Appeal from the Clinton Superior Court

The Honorable Justin H. Hunter, Judge

Trial Court Cause No.
12D01-1508-F6-756

**Robb, Judge.**

# Case Summary and Issues

[1] Following a jury trial, Erin Unger was convicted of dealing in a synthetic drug or synthetic drug lookalike, a Level 6 felony; possession of a synthetic drug or synthetic drug lookalike, a Class A misdemeanor; and possession of paraphernalia, a Class C misdemeanor. The trial court sentenced her to an aggregate term of twelve months with ten of those months suspended to probation. Unger appeals her convictions, raising two issues for our review which we restate as: (1) whether the trial court abused its discretion in admitting evidence; and (2) whether the evidence was sufficient to support her convictions. Concluding the trial court did not abuse its discretion and the evidence was sufficient, we affirm.

# Facts and Procedural History

[2] Unger lived in a two-story house owned by her father, Martin Unger. Unger's boyfriend, Jason Stephens, lived with her in August of 2015. Neighbors reported excessive traffic in and out of the house at all hours, causing law enforcement to begin conducting surveillance of the house. On the morning of August 18, 2015, Detective William Hackerd of the Frankfort Police Department observed Stephens take a paper sack from the driver of a truck and return inside the house. Detective Hackerd also observed Ryan Lukasik, an acquaintance of Stephens, enter and exit the house.

[3] Detective Hackerd later approached Lukasik when he left the house. Detective Hackerd observed a bag containing what he believed to be spice hanging out of Lukasik's pocket. Detective Hackerd informed Lukasik of the surveillance of the house and asked if he would cooperate with police. Detective Hackerd then took Lukasik to the police station where Lukasik made a video-recorded statement. After Lukasik made his statement, officers obtained a warrant to search the house the same day.

[4] Detective Hackerd approached the house and read the search warrant to Martin. Detective Hackerd and Martin entered the kitchen and Detective Hackerd observed "a Ziplock sandwich bag of what looked like synthetic marijuana or Spice" in plain view on the kitchen counter. Transcript, Volume I at 122. Martin informed Detective Hackerd only he and Unger were in the kitchen that morning and that the bag was not there earlier. In Unger's bedroom, Detective Hackerd found multi-colored pipes, which he later testified were located either in a jewelry box or on a nightstand. He observed burnt residue in the bowls of the pipes. Detective Hackerd also found a safe in Unger's bedroom. Unger provided Detective Hackerd with the combination for the safe, which smelled strongly of marijuana when opened. Detective Matthew Feterick of the Clinton County Sheriff's Department helped conduct the search and found more bags containing plant material in a concealed section of a basement wall.

[5] Laboratory tests on the bag found in the kitchen showed it weighed 33.62 grams and indicated the presence of Fluoro AMB. Fluoro AMB is a synthetic

cannabinoid but is not a controlled substance. Laboratory tests performed on one of the bags found in the basement showed it weighed 3.77 grams and also indicated the presence of Fluoro AMB.

[6] Unger was arrested and the State charged her with dealing in a synthetic drug or synthetic drug lookalike, a Level 6 felony; possession of a synthetic drug or synthetic drug lookalike, a Class A misdemeanor; and possession of paraphernalia, a Class C misdemeanor.

[7] Prior to trial, Unger filed a motion to suppress the evidence obtained through the search warrant, arguing the warrant was based solely on unreliable hearsay from Lukasik and failed to establish probable cause to search Unger's home. The trial court denied Unger's motion to suppress. At trial, Unger objected to the admission of the evidence obtained through the search warrant for the same reason. The trial court overruled Unger's objection.

[8] Lukasik testified at trial that he cooperated with Detective Hackerd because he felt intimidated, scared, and "didn't know until the end that I wasn't going to be charged you know with possession or whatever I was gonna be charged with." *Id.* at 80. He testified the contents of the bags found during the search looked like the spice he regularly purchased from Stephens and that it caused sensations "kind of like marijuana." *Id.* at 85. Stephens testified spice is synthetic marijuana and caused effects comparable to marijuana.

[9] The jury found Unger guilty as charged and the trial court sentenced Unger to an aggregate term of twelve months with ten of those months suspended to probation. Unger now appeals.

# Discussion and Decision

## I. Admission of Evidence

### A. Standard of Review

[10] Unger contends the trial court abused its discretion by admitting the evidence obtained from the search in violation of the Fourth Amendment to the United States Constitution.[1] Specifically, Unger alleges the search warrant lacked probable cause and was therefore invalid.

[11] The Fourth Amendment requires that warrants only be issued "upon probable cause, supported by oath or affirmation." An affidavit demonstrates probable cause to search a place if it provides a sufficient basis of fact to permit a reasonably prudent person to believe that a search of the particular premises will uncover evidence of a crime. *Utley v. State*, 589 N.E.2d 232, 236 (Ind. 1992), *cert. denied*, 506 U.S. 1058 (1993). When reviewing a probable cause

---

[1] Unger also invokes Article 1, Section 11 of the Indiana Constitution but offers no authority or independent analysis supporting a separate standard under the state constitution and therefore waives any state constitutional claim. *Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002).

determination, appellate courts consider only the evidence presented to the issuing magistrate. *Jaggers v. State*, 687 N.E.2d 180, 182 (Ind. 1997).

[12] When a probable cause affidavit is based on hearsay, the affidavit must either "(1) contain reliable information establishing the credibility of the source and of each of the declarants of the hearsay and establishing that there is a factual basis for the information furnished; or (2) contain information that establishes the totality of the circumstances corroborates the hearsay." Ind. Code § 35-33-5-2(b). An informant's credibility can be established through declarations against his penal interest. *Houser v. State*, 678 N.E.2d 95, 100 (Ind. 1997).

[13] Finally, the admission or exclusion of evidence is within the sound discretion of the trial court and will not be disturbed on review unless there was an abuse of discretion on the part of the trial court. *Roche v. State*, 690 N.E.2d 1115, 1134 (Ind. 1997). An abuse of discretion involves a decision that is clearly against the logic and effect of the facts and circumstances before the court. *Stone v. State*, 536 N.E.2d 534, 538 (Ind. Ct. App. 1998), *trans. denied*. When reviewing the trial court's ruling on the validity of the search, we consider the evidence most favorable to the trial court's ruling and any uncontradicted evidence to the contrary to determine whether there is sufficient evidence to support the ruling. *Rook v. State*, 679 N.E.2d 997, 999 (Ind. Ct. App. 1997).

## B. The Search Warrant

[14] Unger first contends the search warrant lacked probable cause because it was based solely on unreliable hearsay from Lukasik. She alleges the police had no

prior experience with Lukasik from which they could establish his reliability and none of the information he gave was corroborated. Unger also argues Lukasik's statements were not against his penal interests because he received leniency by avoiding charges in connection with the event.

[15] In support of her argument, Unger cites to *Hirshey v. State*, 852 N.E.2d 1008 (Ind. Ct. App. 2006), *trans. denied*. In *Hirshey*, police asked Holly Godsey, who was arrested for dealing methamphetamine, if she wanted "to do something to help herself with the charge." *Id.* at 1011. Godsey reported purchasing drugs from Brad Hirshey and the police obtained a search warrant for Hirshey's residence based solely on that statement. This court held Godsey's statement was not against her penal interests: she was already arrested, the statements did not increase her criminal liability, and she offered the information to receive leniency. Since the police provided no other evidence when obtaining the warrant, the warrant lacked probable cause. Likewise, Unger argues the police found Lukasik in possession of "spice" and he received leniency for his statement. Then the police obtained a search warrant for Unger's residence based on Lukasik's statement. Therefore, Unger argues that Lukasik, like Godsey, did not act against his penal interests and the warrant lacked probable cause. We find Unger's argument unconvincing.

[16] In contrast to *Hirshey*, Detective Hackerd presented additional evidence corroborating Lukasik's statements. Detective Hackerd observed Lukasik leaving Unger's home and found what he believed to be spice in Lukasik's pocket. Lukasik showed Detective Hackerd a text message from Unger stating

"[W]e are home. We're here. Stop on over." Tr., Vol. I at 71. Lukasik reported regularly going to the house to purchase spice, which was supported by neighbors' complaints of excessive traffic. Detective Hackerd also observed the exchange of a paper sack between Stephens and the driver of a truck in front of the house. The neighbors' complaints, the exchange of the paper sack, and the spice found in Lukasik's pocket corroborated Lukasik's report that spice was being sold at the house. In sum, the totality of the circumstances demonstrated probable cause and the trial court did not abuse its discretion in admitting at trial the evidence obtained as a result of the search warrant.

## II. Sufficiency of Evidence

### A. Standard of Review

Our standard of review for sufficiency claims is well settled. We will not reweigh the evidence or assess the credibility of witnesses. *Smith v. State*, 725 N.E.2d 160, 161 (Ind. Ct. App. 2000). We consider only the evidence most favorable to the verdict, together with all reasonable inferences that can be drawn therefrom. *Id.* If a reasonable trier of fact could have found the defendant guilty based on the probative evidence and reasonable inferences drawn therefrom, then a conviction will be affirmed. *Id.*

### B. Evidence to Support the Possession Conviction

Unger contends the evidence is insufficient to support her conviction for possession of a synthetic drug or synthetic drug lookalike. To convict Unger, the State was required to prove beyond a reasonable doubt that Unger

knowingly or intentionally possessed a synthetic drug or synthetic drug lookalike substance. Ind. Code § 35-48-4-11.5(c). Unger argues the State presented no evidence connecting her to the bag found in the kitchen. Further, she argues the State failed to prove the bag contained a drug as opposed to only fertilizer. We disagree.

[19]    The State presented sufficient evidence the bag found in the kitchen contained a synthetic drug or synthetic drug lookalike substance. Laboratory tests performed on the bag found in the kitchen indicated the bag's contents weighed over thirty grams and contained Fluoro AMB. Fluoro AMB is not a synthetic drug or controlled substance. However, a synthetic drug lookalike substance is "[a] substance, other than a synthetic drug, which any of the factors listed in subsection (c) would lead a reasonable person to believe to be a synthetic drug." Ind. Code § 35-31.5-2-321.5(a)(1). Subsection (c) then provides the following factors to consider:

> (1) The overall appearance of a dosage unit of the substance, including its shape, color, size, markings or lack of markings, taste, consistency, and any other identifying physical characteristics.
>
> (2) How the substance is packaged for sale or distribution, including the shape, color, size, markings or lack of markings, and any other identifying physical characteristics of the packaging.
>
> (3) Any statement made by the owner or person in control of the substance concerning the substance's nature, use, or effect.

(4) Any statement made to the buyer or recipient of the substance suggesting or implying that the substance is a synthetic drug.

(5) Any statement made to the buyer or recipient of the substance suggesting or implying that the substance may be resold for profit.

(6) The overall circumstances under which the substance is distributed, including whether:

> (A) the distribution included an exchange of, or demand for, money or other property as consideration; and

> (B) the amount of the consideration was substantially greater than the reasonable retail market value of the substance the seller claims the substance to be.

[20]     Here, the overall appearance, the overall packaging, and statements by Lukasik and Stephens would lead a reasonable person to believe the bag contained a synthetic drug. Detective Hackerd described it as "a Ziplock sandwich bag of what looked like synthetic marijuana or Spice." Tr., Vol. I at 122. Lukasik testified the substance looked like spice he routinely purchased from Stephens, which caused sensations "kind of like marijuana." *Id.* at 85. Lukasik described spice as synthetic marijuana. Likewise, Stephens referred to the substance he sold Lukasik as spice, which he explained was synthetic marijuana. Stephens testified the substance caused effects comparable to marijuana. As a result, the evidence was sufficient from which the jury could conclude the bag contained a synthetic drug lookalike substance.

[21] As for the element of possession, the State may prove the defendant either actually or constructively possessed the substance. *Washington v. State*, 902 N.E.2d 280, 288 (Ind. Ct. App. 2009), *trans. denied*. Constructive possession occurs when a person has the intent and capability to maintain dominion and control over the item. *Id.*

[22] First, Unger had the capability to maintain dominion and control over the bag found in the kitchen. Proof of possessory interest in the premises where the item is found satisfies the capability prong, regardless of whether possession of the premises is exclusive. *Gee v. State*, 810 N.E.2d 338, 340-41 (Ind. 2004). Detective Hackerd observed the bag in plain view in the kitchen of Unger's residence. Therefore, there was sufficient evidence from which the jury could conclude Unger had the capability to maintain dominion and control over a synthetic drug lookalike substance.

[23] Second, the evidence shows Unger had the intent to maintain dominion and control over the bag found in the kitchen. If a defendant's possession of the premises is non-exclusive, the inference of intent to maintain dominion and control must be supported by additional circumstances pointing to the defendant's knowledge of the nature of the item and its presence. *Id.* at 341. Recognized "additional circumstances" include: (1) incriminating statements; (2) attempted flight or furtive gestures; (3) a setting that suggests drug manufacturing; (4) the proximity of the item to the defendant; (5) whether the item was found in plain view; and (6) the mingling of the item with other items the defendant owns. *Id.*

Here, Detective Hackerd observed the bag in plain view in the kitchen. Martin reported Unger was the only other person in the kitchen that day and that the bag was not there earlier. Unger was present at the house when Detective Hackerd executed the warrant and found the bag. The testimony of both Detective Hackerd and Martin show Unger was in close proximity to the bag. Lukasik purchased spice at Unger's residence after receiving a text message from Unger telling him to come over. The text message is also indicative of her knowledge of the substance. Taking into account Unger's close proximity to the bag, that the bag was found in plain view, and Unger's text message, we conclude the evidence was sufficient to support the jury's determination that Unger constructively possessed a synthetic drug or synthetic drug lookalike substance.

## C. Evidence to Support the Dealing Conviction

Unger next contends there was insufficient evidence to support her conviction for dealing in a synthetic drug or synthetic drug lookalike substance. To convict Unger of dealing, the State was required to prove beyond a reasonable doubt that Unger possessed, with intent to manufacture, finance the manufacture of, deliver, or finance the delivery of, more than five grams of a synthetic drug or synthetic drug lookalike substance. Ind. Code § 35-48-4-10.5(c)(2), (e)(1)(B). Unger argues the State failed to prove the intent element because no one testified at trial she delivered such substance: Lukasik testified he purchased spice from Stephens while Unger was not present, and Stephens testified Unger was unaware he sold spice. Again, we disagree.

[26] In essence, Unger invites us to reweigh the evidence and assess witness credibility, which we cannot do. Lukasik first told Detective Hackerd he purchased the spice from Unger but testified at trial he purchased the spice from Stephens. The jury was aware Lukasik made conflicting statements. Lukasik also testified he texted Unger that morning "to see if anybody was home" before going to the house to purchase spice, and Unger responded "we are home. We're here. Stop on over." Tr., Vol. I at 70-71. Lukasik then went to Unger's residence and purchased "four or five grams" of spice. *Id.* at 74. Further, Lukasik testified he purchased spice from Unger's residence numerous times before. As explained above, the State presented sufficient evidence Unger possessed the bag found in the kitchen containing over thirty grams of a synthetic drug or synthetic drug lookalike substance. The jury could have determined Lukasik's testimony about purchasing the spice from Stephens instead of Unger was not credible in light of the other evidence. In sum, there was sufficient evidence presented from which the jury could conclude Unger was dealing in a synthetic drug or synthetic drug lookalike substance.

## D. Evidence to Support the Paraphernalia Conviction

[27] Finally, Unger contends there was insufficient evidence to support her conviction for possession of paraphernalia. To convict Unger of possession of paraphernalia, the State was required to prove beyond a reasonable doubt that Unger knowingly or intentionally possessed an instrument, a device, or another object she intended to use for introducing a controlled substance into her body. Ind. Code § 35-48-4-8.3(b)(1). Unger argues the State presented insufficient

evidence because the residue inside the pipes was not tested and no one testified the pipes were found somewhere within Unger's control. We disagree.

[28] As noted above, possession may be actual or constructive. Constructive possession occurs when the defendant has the intent and capability to maintain control and dominion over the illicit items. *See supra* ¶¶ 22-24.

[29] First we look at the capability to maintain dominion and control over the paraphernalia. Law enforcement found the pipes in plain view in Unger's bedroom. Because Unger has a possessory interest in her bedroom, there was sufficient evidence from which the jury could conclude Unger was capable of maintaining control and dominion over the pipes.

[30] Next we look at the intent to maintain dominion and control over the paraphernalia. Detective Hackerd found the pipes in plain view in Unger's bedroom either in a jewelry box or on a nightstand. Since Detective Hackerd found the pipes in plain view and mingled with other items Unger owns, the State presented sufficient evidence from which the jury could conclude Unger intended to maintain dominion and control over the pipes.

[31] Finally, we look at Unger's intent to use the paraphernalia to introduce a controlled substance into her body. Intent to introduce a controlled substance may be inferred from circumstantial evidence. *Sluder v. State*, 997 N.E.2d 1178, 1181 (Ind. Ct. App. 2013). Circumstantial evidence establishing intent includes, but is not limited to, "possession of an identifiable amount of narcotics, an instrument, a device, or other object that the person intends to use

for introduction of a controlled substance in the person's body, and/or evidence of or admission to prior drug use." *Perkins v. State*, 57 N.E.3d 861, 865 (Ind. Ct. App. 2016).

[32] As explained above, the State presented sufficient evidence from which the jury could conclude Unger possessed, and was dealing, a synthetic drug or synthetic drug lookalike substance. Lukasik and Stephens referred to the substance Unger possessed as spice, which they explained is synthetic marijuana. Further, while the pipes were not tested for the presence of residue, Detective Hackerd testified he observed burnt material in the bowls of the pipes. In sum, the State presented sufficient evidence from which the jury could find Unger knowingly or intentionally possessed pipes intended for introducing a controlled substance into her body.

# Conclusion

[33] Concluding the trial court did not abuse its discretion in admitting at trial evidence obtained as a result of the search warrant and the evidence was sufficient to support Unger's convictions, we affirm.

[34] Affirmed.

Vaidik, C.J., and Bailey, J., concur.